**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| T.S., an individual;<br><br>               Plaintiff,<br><br>      -against-<br><br>INTERCONTINENTAL HOTELS GROUP PLC,<br>HOLIDAY HOSPITALITY FRANCHISING, LLC,<br>AND WYNDHAM HOTELS AND RESORTS,<br>INC.,<br><br>             Defendants. | CIVIL ACTION NO :2:19-CV-2970<br><br>**FOURTH AMENDED COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

**FOURTH AMENDED COMPLAINT**

COMES NOW the Plaintiff T.S., by and through the undersigned counsel, and respectfully submits her complaint for damages and makes the following averments.

**INTRODUCTION**

1. For years, sex trafficking ventures have brazenly operated in and out of hotels throughout this country. Criminals parade their misconduct openly on hotel properties throughout the United States while the hotels and hospitality industry remain willfully blind to the criminal misconduct to continue earning a profit at the expense of human life, human rights, and human dignity.

2. InterContinental Hotels Group PLC, together with its fully owned subsidiary Holiday Hospitality Franchising ("HHF") (hereinafter collectively "IHG"),[1] and Wyndham Hotels and Resorts, Inc. (hereinafter "Wyndham") know and have known for more than a decade that sex trafficking repeatedly occurs under their flag throughout the country. Rather than taking timely and effective measures to thwart this epidemic, IHG and Wyndham have instead chosen to ignore the open and obvious presence of sex trafficking on their properties, enjoying the profit from rooms rented for this explicit and apparent

---

[1] Holiday Hospitality Franchising, LLC is a fully owned subsidiary of InterContinental Hotels Group PLC. *See* Securities and Exchange Commission Form 20-F, InterContinental Hotels Group PLC for the fiscal year ending December 31, 2018, at p.159 available at
https://www.sec.gov/Archives/edgar/data/858446/000119312519055722/d630180d20f.htm#ar630180_52 .

2

purpose.

3.    This action for damages is brought by the Plaintiff, a survivor of sex trafficking hereinafter identified by her initials T.S., under the federal William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 (hereinafter "TVPRA").

4.    T.S. was first trafficked for commercial sex at the age of 15 years old in her native West Virginia. Her first trafficker was a family friend who picked her up from a Kroger grocery store parking lot promising her that he knew a way that she "could make him proud." Further preying on the teenage girl's normal adolescent desire for attention and approval, T.S.'s first trafficker would routinely reward her with beer and crack cocaine for the "good work" that she did performing commercial sex work on adult men for his profit.  Eventually this trafficker became violent, and T.S. ran away only to be preyed upon by other traffickers who bought, sold, and required her to sexually service paying strangers as she endured brutal physical assaults, psychological torment, verbal abuse, and false imprisonment at the Defendants' hotels for nearly a decade as the Defendants did nothing but profit.

5.    The Plaintiff now brings this action for damages against the Defendants listed herein.  Each of the Defendants, in violation of 18 U.S.C. § 1595, knowingly benefited from facilitating a venture that they knew, or at the very least should have known, to be engaging in sex trafficking in violation of 18 U.S.C. § 1591(a).

6.    T.S. was advertised on www.backpage.com against her will, physically tortured, and then sexually exploited under such duress at hotels in Steubenville and Youngstown, Ohio, including the Holiday Inn® and the Super 8®.

7.    As a direct and proximate result of IHG, and Wyndham's consistent refusals to prevent human trafficking on their hotel properties, T.S. was sex trafficked, sexually exploited, and victimized repeatedly at IHG and Wyndham hotels.

8.    The Plaintiff brings this action pursuant to the Trafficking Victims Protection Reauthorization Act 18 U.S.C. §1595, against the Defendants who enabled, harbored, held, facilitated, and financially benefited from a sex trafficking venture in which T.S. was trafficked for the purpose of commercial sex,

sexually exploited, and brutally victimized in violation of 18 U.S.C. §1591 (a).

**PARTIES**

9.    The Plaintiff, having moved to proceed anonymously,[2] and, herein, identified by her initials T.S., was 15 years old when she was first sold for sex and 25 years old when she was trafficked throughout Ohio for the purposes of commercial sex.  The Plaintiff is a victim of trafficking pursuant to 22 U.S.C. §7102 (15) and 18 U.S.C. §1591 (a), and a victim of a "severe form of trafficking" as it is defined under 22 U.S.C §7102 (14).   The Plaintiff is a resident and citizen of the State of Ohio, currently residing in Cincinnati, Ohio.

10.    Defendant InterContinental Hotels Group PLC ("IHG") is one of the largest hotel brands in the world offering public lodging services directly or through its affiliates, subsidiaries, and franchisees.  It is an English corporation with its principle place of business at Broadwater Park, Denham, Buckinghamshire, UB9 5HR, UK.

    a.    Defendant Holiday Hospitality Franchising, LLC ("HHF") is a wholly owned subsidiary of InterContinental Hotels Group PLC ("IHG").  It is a Delaware corporation and can be served by its registered agent Corporation Service Company, 50 West Broad Street, Suite 1330, Columbus, Ohio 43215.

    b.    Holiday Inn® is an IHG brand property under its HHF group.

    c.    As a hotel operator, Defendant IHG controls the training and policies for its branded properties including the Holiday Inn® hotel where T.S. was trafficked. Defendant IHG represents that it considers guest safety and security important and requires the hotels in its portfolio to comply with IHG brand standards and all local, state, and federal laws.[3]

---

[2] Contemporaneously with the Complaint, Plaintiff T.S. filed a Motion for Protective Order and Leave to Proceed Anonymously with Memorandum in Support based upon the nature of the allegations in the instant Complaint, which are of an inherently intimate and personal nature. That motion is pending. Undersigned Counsel will provide her identity to counsel for the Defendants upon proper effectuation of service.

[3] Inter-Continental Hotels Group, Modern Slavery Statement 2017 available at https://www.ihgplc.com/-/media/ihg/Files/pdf/modern-slavery-statement-2017-ihg-010318.ashx?la=en&hash=B688F42E878C145EC5C8C9DF02ABC227 (last visited Nov. 22, 2019). *See* Holiday Hospitality Franchising, LLC is a fully owned subsidiary of InterContinental Hotels Group PLC. *See* Securities and Exchange Commission Form 20-F, InterContinental Hotels Group PLC for the fiscal year ending December 31, 2018, at p.179 available at

    d.   Through its relationship with its agents, subsidiaries, and the staff at the Holiday Inn® where T.S. was trafficked and the perpetrator who trafficked T.S. at Holiday Inn® hotels while registered as a guest there, Defendant IHG knowingly benefited or received something of value from its facilitation of or participation in a venture which it knew or should have known had engaged in sex trafficking.

    e.   IHG receives a percentage of the gross room revenue from the operations of Holiday Inn® hotels, including a percentage of the revenue generated from the rate charged for the hotel guest rooms in which the Plaintiff was sex trafficked.[4]

    f.   IHG owns, supervises, and/or operates the Holiday Inn® Steubenville located at 1401 University Boulevard, Steubenville, OH 43952.

    g.   IHG is subject to the jurisdiction of this Court because it regularly transacts business in Ohio, operates dozens of hotels in Ohio, including the Holiday Inn® Steubenville, contracts to supply services in Ohio, caused indivisible injuries to the Plaintiff in Ohio, and profited from an illegal sex trafficking venture at the Holiday Inn® Steubenville in Ohio.

11.    Defendant Wyndham Hotels and Resorts, Inc. ("Wyndham") is one of the largest hotel brands in the world with nearly 9,000 branded properties in more than eighty (80) countries. It offers public lodging services directly or through its affiliates, subsidiaries, and franchisees. It is a Delaware corporation and can be served by its registered agent Corporate Creations Network, Inc., 3411 Silverside Road, Suite 104, Wilmington, Delaware 19810.

    a.   Defendant Wyndham Hotels and Resorts, Inc. is the successor entity to the former Wyndham Worldwide Corporation and therein retains successor liability for the wrongful acts of its predecessor.

---

https://www.sec.gov/Archives/edgar/data/858446/000119312519055722/d630180d20f.htm#ar630180_52 .

[4] *Id* at p.14.

5

b. Super 8® is a Wyndham brand property.

c. As a hotel operator, Defendant Wyndham controls the training and policies for its branded properties including the Super 8® hotel where T.S. was trafficked.

d. Defendant Wyndham maintains that it considers guest safety and security to be important and requires the hotels in its portfolio to comply with Wyndham brand standards and all local, state, and federal laws.[5]

e. By and through its relationship with the staff at the Super 8® hotel where T.S. was trafficked and the perpetrator who trafficked T.S. at the Super 8® hotel while registered as a guest there, Defendant Wyndham knowingly benefited, or received something of value, from its facilitation of, or participation in, a venture which it knew or should have known to engage in sex trafficking.

f. Wyndham receives a percentage of the gross room revenue generated by the operations of Super 8® hotels, including a percentage of the revenue generated from the rate charged for the hotel rooms in which the Plaintiff trafficked.

g. At all relevant times, Wyndham owned, supervised, and/or operated the Super 8® located at 4250 Belmont Ave, Youngstown, OH 44505.

h. Wyndham is subject to the jurisdiction of this Court because it regularly transacts business in Ohio, operates dozens of hotels in Ohio, including the Super 8® in Youngstown, contracts to supply services in Ohio, caused indivisible injuries to the Plaintiff in Ohio, and profited from an illegal sex trafficking venture at the Super 8® Youngstown.

12. Whenever reference is made in this Complaint to any act, deed or conduct of the Defendants, the allegation is that the Defendants engaged in the act, deed, or conduct by or through one or more of their officers, directors, agents, employees, or representatives who was actively engaged in the

---

[5] Wyndham Hotels and Resorts, 2019 Social Responsibility Report: Protecting Our Human Rights (p.30) available at https://corporate.wyndhamhotels.com/wp-content/uploads/2019/07/Wyndham-GRI-2019-Final_web.pdf (last visited Nov. 20, 2019).

management, direction, control, or transaction of the ordinary business and affairs of the Defendants.

## JURISDICTION AND VENUE

13.   This Honorable Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 because this action arises under the Constitution, laws, or treaties of the United States (with an amount in controversy that exceeds $75,000.)

14.   Venue is proper in this district pursuant to 28 U.S.C. §1391 because a substantial part of the events or omissions giving rise to the claims asserted in this action, including the Defendants' misconduct and omissions, occurred in the judicial district where this action is brought.

## SEX TRAFFICKING UNDER FEDERAL LAW

15.   Sex trafficking is defined by the TVPRA under 22 U.S.C. § 7102, as "the recruitment, harboring, transportation, provision, obtaining, patronizing, or soliciting of a person for the purposes of a commercial sex act and in which the commercial sex act is induced by force, fraud, or coercion." This definition combines the three elements of sex trafficking as a criminal offense: the act, the means, and the purpose.

16.   To best understand the mechanism by which sex trafficking ventures are prohibited by federal criminal law, it's best to address these elements in the reverse.  Sex trafficking is slavery for the *purpose* of commercial sex, a lens on the already existing crimes prohibited by 18 U.S.C. § 1589 and §1590.  The crime of slavery can then be divided into the two (2) elements remaining: the act and the means.  The *act* is the "harboring, transporting, providing, or obtaining," of forced labor, codified as a violation of 18 U.S.C. §1590, while the *means* is labor "obtained or provided by force, fraud or coercion" and is codified as a violation of 18 U.S.C. §1589.

17.   Thus, while the complete definition of 'sex trafficking' is found in the TVPRA under 22 U.S.C. § 7102, and it is specifically prohibited under 18 U.S.C. §1591, it is nevertheless a long-recognized and familiar atrocity.

18.   Pursuant to 18 U.S.C. §1591(a), all who knowingly provide *or* obtain commercial sex that was provided or obtained through force, fraud, and coercion are guilty of sex trafficking.  This includes, at a

7

minimum, **_both_** the 'traffickers' who recruit, harbor, transport, and provide individuals for forced commercial sex work **_and_** the 'Johns' or 'buyers' who obtain, solicit, or patronize forced commercial sex work.[6]

## FACTUAL ALLEGATIONS

### A.  THE HOSPITALITY INDUSTRY'S PARTICIPATION IN THE SEX TRAFFICKING INDUSTRY

*"75% of survivors responding to Polaris's survey reported coming into contact with hotels at some point during their exploitation…Unfortunately, 94% also disclosed that they never received any assistance, concern, or identification from hotel staff."*

*-The Polaris Project* [7]

19.  Human trafficking is the world's fastest growing crime.[8]  While the term 'human trafficking' incorporates all forced labor, the sex trafficking industry alone pulls in an estimated $99 billion each year making it the second largest illicit crime industry behind only the sale of **_all_** illegal drugs.[9]

20.  Sex traffickers, or 'pimps', use threats, violence, manipulation, lies, debt bondage, and other forms of coercion to compel adults and children to engage in commercial sex acts against their will.

21.  The hospitality industry plays a crucial role in the sex trade.[10]  The trope of the "no-tell motel" is certainly not a new one.  Hotels have long profited from their reputations as havens of privacy and discretion for the offending.  Hotels offer anonymity and non-traceability, making them ideal venues for crime and sex trafficking in particular.

22.  According to National Human Trafficking Hotline statistics, hotels are the top-reported venue,

---

[6] While the 'pimps' or 'providers' are often referred to as the 'traffickers' and the purchasers are referenced as the 'Johns', 'tricks', or 'buyers' [and such nomenclature is used herein], under federal law **_both_** categories are 'traffickers'.

[7] *Recommendations for Hotels and Motels*, THE POLARIS PROJECT, https://polarisproject.org/hotels-motels-recommendations (last visited June 19, 2019).

[8] *Human Trafficking is the World's Fastest Growing Crime*, THE ADVISORY BOARD (May 22, 2017, 9:30 AM), https://www.advisory.com/daily-briefing/2017/05/22/human-trafficking.

[9] *Profits and Poverty: The Economics of Forced Labor*, INTERNATIONAL LABOR ORGANIZATION (May 24, 2014), http://www.ilo.org/global/publications/ilo-bookstore/order-online/books/WCMS_243391/lang--en/index.htm.

[10] Giovanna L. C. Cavagnaro, *Sex Trafficking: The Hospitality Industry's Role and Responsibility*, CORNELL UNIVERSITY SCHOOL OF HOTEL ADMINISTRATION (2017), http://scholarship.sha.cornell.edu/honorstheses/3.

even over commercial front brothels, where sex trafficking acts occur.[11]  Traffickers and buyers alike frequently use hotel rooms to exploit victims.

23.  Traffickers use hotels as the hub of their operations. Inside, the victims are harbored, raped, assaulted, and forced to service buyers who come to the hotel solely to purchase sex.  This is referred to as an 'in call'.

24.  Hotels are also the venue of choice for buyers seeking an 'out call,' wherein the buyer rents a hotel room and the trafficker delivers the victim to the buyer's room to complete the sordid transaction. Unsurprisingly, those on the demand side of this transaction (i.e. those purchasing sex) typically choose to engage in trafficking away from their home, naturally leading to the increased involvement of hotels.  In New York City alone, 45% of all reported sexual exploitation took place in hotels, including the Ritz Carlton and the Plaza.[12]

25.  The problem is industry wide.  In the United States, as much as 63% of all trafficking incidents happen in hotels ranging from luxury to economy.[13]

26.   Due to the overall complacency of the hospitality industry on addressing the issue, hotels are *the* venue of choice for sex trafficking.[14]  Traffickers and buyers capitalize on the hotel industry's general refusal to adopt and enforce companywide anti-trafficking policies from the corporate to the property level, train staff on what to look for and how to respond, and/or establish safe and secure reporting mechanisms for those at the point of sale.

27.  Every day, thousands of hotel employees witness manifestations of sex trafficking and commercial exploitation.  Thus, the hospitality industry has the greatest reach to prevent, identify and thwart sexual exploitation where it is most likely to occur.

28.  But aside from their unique position in this epidemic, hotels and motels have the highest

---

[11] *National Human Trafficking Hotline Statistics*, THE POLARIS PROJECT (2016), https://polarisproject.org/resources/2016-hotline statistics.

[12] Giovanna L. C. Cavagnaro, *Sex Trafficking: The hospitality Industry's Role and Responsibility*, CORNELL UNIVERSITY, SCHOOL OF HOTEL ADMINISTRATION (2017), http://scholarship.sha.cornell.edu/honorstheses/3.

[13] Michele Sarkisian, *Adopting the Code: Human Trafficking and the Hospitality Industry*, CORNELL HOSPITALITY REPORT, 15(15), 3-10 (2015).

[14] *Hotels Initiative*, THE POLARIS PROJECT, https://polarisproject.org/initiatives/hotels (last visited June 19, 2019).

obligation to protect their guests from known dangers, including sex trafficking and sexual exploitation, and should be held accountable when they fail to comply. As aptly stated in a publication by the Cornell University School of Hospitality, "the hospitality industry is undoubtedly involved in the sex trafficking industry…and therefore has an inherent responsibility to deter the crime and can be liable for failing to do so."[15]

29. Training hotel staff to identify the signs of sex trafficking and sexual exploitation is a critical and obvious legal obligation for the hospitality industry. The presence of sex trafficking and sexual exploitation in a hotel is frequently an obvious occurrence and, although unutilized, underutilized, or ineffectively utilized, numerous well-researched trainings and toolkits have been published to the hotel industry over the last decade to help hotel staff in every position to identify the signs.[16]

30. From check-in to check-out there are a number of indicators that traffickers and their victims exhibit during their stay at a hotel. With proper training and the implementation of reasonable security measures, hospitality companies could prevent regular sex trafficking under their flag.

31. Obvious signs of sex trafficking at a hotel may include: an excess of condoms in rooms, individuals carrying or flashing large amounts of cash, excessive amounts of cash stored in the room, renting two (2) rooms next door to each other, declining room service for several consecutive days, significant foot traffic in and out of room(s), men traveling with multiple women who appear unrelated, women known to be staying in rooms without leaving, women displaying physical injuries or signs of fear and anxiety, guests checking in with little or no luggage, hotel guests who prevent another individual from speaking for themselves, or a guest controlling another's identification documents.[17]

32. Obviously, hotel staff who have undergone training are more aware of sex trafficking when it

---

[15] Giavanna L. C. Cavagnaro, *Sex trafficking: The Hospitality Industry's Role and Responsibility*, CORNELL UNIVERSITY, SCHOOL OF HOTEL ADMINISTRATION (2017), http://scholarship.sha.cornell.edu/honorstheses/3.

[16] DEPARTMENT OF HOMELAND SECURITY, *Blue Campaign Toolkit*, attached as "Exhibit A." Available at: https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf.

[17] Id. See also, Shea M. Rhodes, *Sex Trafficking and the Hotel Industry: Criminal and Civil Liability for Hotels and their Employees*, THE INSTITUTE TO ADDRESS CRIMINAL SEXUAL EXPLOITATION, Villanova University School of Law (2015), https://cseinstitute.org/wp-content/uploads/2015/06/Hotel_Policy_Paper-1.pdf.

happens and are more willing to report it than hotel staff who have not been trained.[18] Thus, hospitality companies are obligated to adopt policies and procedures related to sex trafficking and to enforce these policies and procedures as brand standard through to the property level.

33. Hospitality companies can and should mandate that *all* staff working at *all* hotel properties across their brand complete sex trafficking training.[19]

34. The hospitality industry has been cognizant of their role and responsibilities in the sex trafficking industry for years.

35. In 2011, Wyndham Hotels trained only some of its employees to look for signs of trafficking.[20]

36. In 2012, an anti-trafficking coalition alerted Defendants Choice Hotels of the likelihood of sex trafficking during the London Olympics, and inquired about the companies anti-trafficking policies, while urging immediate action regarding trafficking.[21]

37. Choice Hotels claims it has supported the anti-trafficking group Polaris since 2010 and in a partnership with EPCAT ((End Child Prostitution, Pornography and Trafficking of Children for Sexual Purposes)) developed a training module in 2010 for hotel management and staff.[22]

38. In 2013, IHG commissioned an external assessment of human rights risks most relevant for the travel and hospitality sector globally and regionally working with external human rights experts, Maplecroft. The risks identified included human trafficking.[23]

39. In 2015 and 2016 IHG identified the modern slavery risks most relevant to IHG across four different areas of risk: (I) risks of modern slavery affecting their organization including IHG hotels, (ii)

---

[18] Giavanna L. C. Cavagnaro, *Sex Trafficking: The Hospitality Industry's Role and Responsibility*, CORNELL UNIVERSITY, SCHOOL OF HOTEL ADMINISTRATION (2017), http://scholarship.sha.cornell.edu/honorstheses/3.

[19] Shea M. Rhodes, *Sex Trafficking and the Hotel Industry: Criminal and Civil Liability for Hotels and their Employees*, The Institute to Address Criminal Sexual Exploitation, Villanova University School of Law (2015), https://cseinstitute.org/wp-content/uploads/2015/06/Hotel_Policy_Paper-1.pdf.

[20] Katie Lobosco, *Super 8 workers trained to spot sex trafficking*, CNN BUSINESS (Nov. 18, 2014), https://money.cnn.com/2014/11/18/news/companies/days-inn-sex-trafficking/.

[21] *Corporate Strategy to Address Human Trafficking: Investor Recommendations for London Olympic Sponsors and Hospitality Companies, Christian Brothers Investment Services*, CBIS, http://cbisonline.com/us/wp-content/uploads/sites/2/2012/09/FINAL_OlympicsReport_9_28.pdf (last visited June 19, 2019).

[22] *Human Rights Policy*, CHOICE HOTELS, https://www.choicehotels.com/about/responsibility/human-rights-policy (last visited June 6, 2019).

[23] Inter-Continental Hotel Group, Modern Slavery Statement 2017 available at https://www.ihgplc.com/-/media/ihg/Files/pdf/modern-slavery-statement-2017-ihg-010318.ashx?la=en&hash=B688F42E878C145EC5C8C9DF02ABC227 (last visited Nov. 22, 2019).

11

risks of modern slavery occurring in IHG corporate or hotel supply chains, (iii) risks of modern slavery such as human trafficking occurring in or around IHG branded hotels, (iv) risks of modern slavery occurring at different stages of the hotel lifecycle. IHG represents that its various risk assessment mechanisms have helped them to identify higher risk locations since 2013.

40. Further, nationwide campaigns recognized the issue of human trafficking in the hotel industry and the lack of internal policies to address the issue, and took initiative as early as 1997 with the United Nations Blue Heart Campaign and domestically in 2010 with the Department of Homeland Security's Blue Campaign.[24] These efforts sought to educate both the public and private sectors on identifying and combatting human trafficking, including the hospitality industry and both campaigns released online resources and toolkits publicly accessible to any entity concerned with human trafficking.[25]

41. Hospitality companies have both the power and responsibility to make sex trafficking difficult for the offenders. Yet, they either repeatedly fail to heed the call or repeatedly failed to execute their own policies. Instead, each continues to facilitate these crimes at their hotels, content to direct their efforts solely to profit and the bottom line.

### B. THE DEFENDANTS CONTROL THE HOSPITALITY INDUSTRY

42. Hotel brands or flags lend their name and likeness to third party owners, while the building and operations are run by a franchisee or third party management company under the brands' control. In return, the parent brand exchanges the high risk that is inherent in owning an asset like a hotel for the low risk associated with owning a contract or franchise agreement and still profits from putting heads in beds.

43. The average consumer does not see this relationship. The parent brand gives the property its identity. It provides signage on and in front of the building that assures customers that if they check

---

[24] *DHS Blue Campaign Five Year Milestone*, DEPARTMENT OF HOMELAND SECURITY (Jul. 22, 2015), https://www.dhs.gov/blog/2015/07/22/dhs-blue-campaign-five-year-milestone.
[25] *Human Trafficking and the Hospitality Industry*, DEPARTMENT OF HOMELAND SECURITY, https://www.dhs.gov/blue-campaign/hospitalityindustry (last visited June 19, 2019).

into that hotel they can expect the standards consistent with the parent hotel brand.  The same brand emblazoned on everything in the hotel from the pens in the bedside tables to the staff uniforms at the front desk.

44.   In addition to brand recognition, a marketing organization, hotel listings in the Global Distribution System (GDS) and other online travel agency databases, the brand provides the local hotel with access to its brand wide central reservation system, 800 number, revenue management tools, world-class loyalty programs and a website.  Thus, booking and room reservations are controlled by the corporate parent brand.[26]

45.   The local hotel typically pays around 10% of their total revenue back to the parent hotel brand and is required to develop and maintain the property in accordance with the parent brand's standards as they are laid out in the franchise agreement.

46.   Per the contract or franchise agreement, the parent brand may enforce these standards through periodic inspections and even termination of the agreement if the local hotel is found to be inadequate. The right of the parent hotel brand to enforce their brand standards is also their responsibility.

47.   At the time of the incidents alleged herein:

   a.   Defendant IHG owned and controlled the Holiday Inn® brand.

   b.   Defendant Wyndham owned and controlled the Super 8® brand.

48.   Parent hotel brands may kick delinquent hotels out of their system but it is at the expense of terminating their royalty payments.

### C.  THE DEFENDANTS' WILLFUL BLINDNESS TO SEX TRAFFICKING AT THEIR HOTELS

49.   Defendants IHG, and Wyndham have been on notice of repeated incidences of sex trafficking occurring at their Holiday Inn® and Super 8® hotels yet these brand managers have failed to take the necessary action to prevent sex trafficking and still persist in failing to take the necessary action to prevent and stop sex trafficking at their hotels.

---

[26] Ellen Meyer, *The Origins and Growth of Franchising in the Hotel Industry*, LODGING MAGAZINE (April 10, 2018) https://lodgingmagazine.com/the-origins-and-growth-of-franchising-in-the-hotel-industry/.

a.  INTER-CONTINENTAL HOTELS GROUP PLC ("IHG") Defendants IHG own, supervise, operate, and/or license the Holiday Inn® Steubenville located at 1401 University Boulevard, Steubenville, OH 43952. IHG failed to implement and enforce any of its own policy or policies and protect Plaintiff T.S. from being sex trafficked.

b.  IHG knew or should have known that the Holiday Inn® hotel where Plaintiff T.S. was trafficked was an area known for high incidence of crime and prone to sex trafficking activity on and around the hotel premises, including when Plaintiff T.S. was trafficked.[27]

c.  Despite having knowledge of the extensive prostitution and sex trafficking that occurs at its hotels, Defendant IHG have repeatedly failed to stop these actions.

d.  Defendants IHG exercised could have control over Holiday Inn® hotels by:

   i.  distributing information to assist employees in identifying human trafficking;

   ii.  providing a process for escalating human trafficking concerns within the organization;

   iii.  requiring employees to attend training related to human trafficking;

   iv.  providing new hire orientation on human rights and corporate responsibility;

   v.  providing training and education to Holiday Inn® branded hotels through webinars, seminars, conferences, and online portals;

   vi.  developing and holding ongoing training sessions on human trafficking; or

   vii.  providing checklists, escalation protocols and information to property management staff; or tracking performance indicators and key metrics on human trafficking prevention.

e.  IHG were in an agency relationship with Holiday Inn® hotels offering public lodging services in the hotel. This agency relationship was created through Defendant IHG's exercise of an ongoing and systemic right of control over Holiday Inn® hotels by

---

[27] *Steubenville Crime Rates*, NEIGHBORHOOD SCOUT, https://www.neighborhoodscout.com/oh/steubenville/crime (last visited Jun. 21, 2019).

14

Defendants' operations, including the means and methods of how Holiday Inn® branded hotels conducted daily business through one or more of the following actions:

    i. hosting online bookings on Defendant IHG's domains;

    ii. requiring Holiday Inn® branded hotels to use Defendant IHG's customer rewards program;

    iii. setting employee wages;

    iv. making employment decisions;

    v. advertising for employment;

    vi. sharing profits;

    vii. standardized training methods for employees;

    viii. building and maintaining the facility in a manner specified by the owner;

    ix. standardized or strict rules of operation;

    x. regular inspection of the facility and operation by owner;

    xi. fixing prices; or

    xii. other actions that deprive Holiday Inn® hotels of independence in business operations.

f. An apparent agency also exists between Defendants IHG and HHF, and Holiday Inn® hotels. Defendants IHG held out Holiday Inn® hotels to the public as possessing authority to act on its behalf.

g. Given Defendants' public statements on behalf of its hotel brands and the control it assumed in educating, implementing, and directing its branded hotels, including Holiday Inn® branded hotels, Defendants IHG breached its duties in the following ways:

    i. did not adequately distribute information to assist employees in identifying human trafficking;

    ii. failed to provide a process for escalating human trafficking concerns within the organization;

    iii.    failed to mandate managers, employees, or owners attend training related to human trafficking;

    iv.    failed to provide new hire orientation on human rights and corporate responsibility;

    v.    failed to provide training and education on human trafficking through webinars, seminars, conferences, and online portals;

    vi.    failed to develop and hold or require ongoing training sessions on human trafficking; or

    vii.    failed to provide checklists, escalation protocols and information to property management staff or tracking performance indicators and key metrics on human trafficking prevention.

h.    For years, Defendants IHG have failed to adequately address the rampant culture of sex trafficking which tragically occurs throughout its Holiday Inn® properties across the country. This same entrenched and pervasive willful blindness to sex trafficking facilitated the trafficking of the Plaintiff at the Holiday Inn® Steubenville that forms the basis of this complaint.

    i.    In September 2018, a bloods gang member used threats and violence to force women into prostitution. He was arrested at the Holiday Inn® in Plainview, New York.[28]

    ii.    In October 2017, a man was arrested for trafficking minors at a Holiday Inn® in Knoxville, Tennessee. During the police sting, the authorities found a minor the man had harbored in his car that was reported missing in Asheville, North Carolina.[29]

---

[28] *Police Say Bloods Member Arrested for Sex Trafficking*, AP NEWS (Sept. 1, 2018), https://www.apnews.com/ab1302acec7c47d49196917f7e73d6e6.
[29] *Missing NC Teen Found During Human Trafficking String Operation*, WSPA (Oct. 13, 2017), https://www.wspa.com/news/missing-nc-teen-found-during-human-trafficking-sting-operation/1009065813.

iii. In December 2017, a man forced a woman to take drugs, burned her skin and forced her to sell herself for sex. The victim met the man at a Holiday Inn® in Bethlehem, Pennsylvania for a date, but soon became his slave.[30]

iv. In August 2018, three people were arrested at a Holiday Inn® in Tyler, Texas for trafficking a woman and forcing her to engage in sex with multiple johns who responded to her backpage.com advertisement.[31]

v. In October 2018, a couple trafficked a woman out of a Holiday Inn® in Minot, North Dakota. She was forced to service 3-5 clients a day, at $120-$220 a person, in order to pay for the pair's hotel rooms and methamphetamines.[32]

vi. In November 2018, a man lured a missing woman into his hotel room where he posted advertisements of her on classified websites to engage in sex. Police retrieved text messages between the pimp and victim where the victim mentioned being at the Holiday Inn® in the Bronx, New York.[33]

50. WYNDHAM HOTELS AND RESORTS, INC. ("Wyndham")

a. Defendant Wyndham, supervised, or operated the Super 8® Youngstown located at 4250 Belmont Ave, Youngstown, OH 44505.

b. Wyndham failed to implement and enforce any of its own policy or policies and protect Plaintiff T.S. from being sex trafficked.

i. Wyndham knew or should have known that the Super 8® hotel where Plaintiff T.S. was trafficked was an area known for high incidence of crime and prone to sex trafficking

---

[30] Rudy Miller, *Lehigh Valley Police Uncover Nationwide Sex Trafficking Ring*, LEHIGH VALLEY LIVE (Dec. 1, 2017), https://www.lehighvalleylive.com/bethlehem/2017/12/local_police_uncover_nationwid.html.
[31] *2 Arrested, 1 More Implicated in Smith County Human Trafficking Case*, EAST ESSEX MATTERS (Aug. 28, 2018), https://www.easttexasmatters.com/news/local-news/2-arrested-1-more-implicated-in-smith-county-human-trafficking-case/1402220169.
[32] Andrea Johnson, *Andrea Beck, Richard Spain Charged With Human Trafficking*, MINOT DAILY NEWS (Oct. 11, 2018), http://www.minotdailynews.com/news/local-news/2018/10/andrea-beck-richard-spain-charged-with-human-trafficking/.
[33] M. L. Nestel, *Alleged 'Pimp' Who Forced Women Into Prostitution, Including Missing Pennsylvania Teenager, Charged*, NEWSWEEK (Nov. 2, 2018), https://www.newsweek.com/corinna-slusser-missing-pennsylvania-ishi-woney-fbi-nypd-new-jersey-1198253.

17

activity on and around the hotel premises, including when Plaintiff T.S. was trafficked.[34]

   c.  Despite having knowledge of the extensive prostitution and sex trafficking that occurs at its hotels, Defendant Wyndham has repeatedly failed to stop these actions.

   d.  Defendant Wyndham could have exercised control over Super 8® hotels by:

      i.  distributing information to assist employees in identifying human trafficking;

      ii.  providing a process for escalating human trafficking concerns within the organization;

      iii.  requiring employees to attend training related to human trafficking;

      iv.  providing new hire orientation on human rights and corporate responsibility;

      v.  providing training and education to Super 8® hotels through webinars, seminars, conferences, and online portals;

      vi.  developing and holding ongoing training sessions on human trafficking; or

      vii.  providing checklists, escalation protocols and information to property management staff; or tracking performance indicators and key metrics on human trafficking prevention.

   e.  Wyndham was in an agency relationship with Super 8® hotels offering public lodging services in the hotel. This agency relationship was created through Defendant Wyndham's exercise of an ongoing and systemic right of control over Super 8® hotels by Defendant Wyndham's operations, including the means and methods of how Super 8® hotels conducted daily business through one or more of the following actions:

      i.  hosting online bookings on Defendant Wyndham's domain;

      ii.  requiring Super 8® branded hotels to use Defendant Wyndham's customer rewards program;

      iii.  setting employee wages;

---

[34] *Youngstown Crime Rates*, NEIGHBORHOOD SCOUT, https://www.neighborhoodscout.com/oh/youngstown/crime (last visited Jun. 21, 2019). *See* Youngstown Ranked Ninth Most Dangerous City, 21WFMJ, (Oct. 30, 2006) https://www.wfmj.com/story/5606829/youngstown-ranked-ninth-most-dangerous-city.

    iv.   making employment decisions;

    v.   advertising for employment;

    vi.   sharing profits;

    vii.   standardized training methods for employees;

    viii.   building and maintaining the facility in a manner specified by the owner;

    ix.   standardized or strict rules of operation;

    x.   regular inspection of the facility and operation by owner;

    xi.   fixing prices; or

    xii.   other actions that deprive Super 8® hotels of independence in business operations.

51. An apparent agency also exists between Defendant Wyndham and Super 8® hotels. Defendant Wyndham held out Super 8® hotels to the public as possessing authority to act on its behalf.

52. Given Defendant Wyndham's public statements on behalf of its hotel brands and the control it assumed in educating, implementing, and directing its hotels, including Super 8® hotels, Defendant Wyndham breached its duties in the following ways:

    a.   did not adequately distribute information to assist employees in identifying human trafficking;

    b.   failed to provide a process for escalating human trafficking concerns within the organization;

    c.   failed to mandate managers, employees, or owners attend training related to human trafficking;

    d.   failed to provide new hire orientation on human rights and corporate responsibility;

    e.   failed to provide training and education on human trafficking through webinars, seminars, conferences, and online portals;

    f.   failed to develop and hold or require ongoing training sessions on human trafficking; or

19

g. failed to provide checklists, escalation protocols and information to property management staff or tracking performance indicators and key metrics on human trafficking prevention.

53. For years, Defendant Wyndham has failed to address the rampant culture of sex trafficking which tragically occurs throughout its Super 8® properties across the country. This same entrenched and pervasive willful blindness to sex trafficking facilitated the trafficking of the Plaintiff at the Super 8® Youngstown that forms the basis of this complaint.

a. The Central Ohio Human Trafficking Task Force completed an investigation which resulted in indictments in August 2012, of several persons charged with human trafficking which occurred at the Super 8 hotel on Dublin-Granville Road in Columbus, Ohio as well as other locations.[35]

b. A trafficker took at 17 year old girl to a Super 8® in West Greenwich, Rhode Island in September 2013 and ultimately pled guilty to federal sex trafficking charges for his criminal conduct.[36]

c. In June 2014, federal authorities charged a man with human trafficking after arresting him at a Super 8® in Wyoming, Michigan where he had taken a 15 year old girl.[37]

d. An undercover federal agent discovered two girls ages 18 and 15 at a Super 8® in El Paso, Texas in July 2016, and charged their trafficker with two counts of sex trafficking children by force.[38]

---

[35] John Futty, *Secret Panel on Human Trafficking Wins Indictments* The Columbus Dispatch, https://www.dispatch.com/content/stories/local/2012/08/03/secret-panel-on-human-trafficking-wins-indictments.html

[36] Michael McKinney, *Missouri Man Pleads Guilty to Sex Trafficking for Bringing 17 Year Old Massachusetts Girl to Rhode Island*, PROVIDENCE JOURNAL,https://www.providencejournal.com/breaking-news/content/20140227-missouri-man-pleads-guilty-to-sex-trafficking-for-bringing-17-year-old-massachusetts-girl-to-rhode-island.ece

[37] Barton Deiters, *Man accused of human trafficking of 15-year-old girl in Wyoming,* MLIVE, (June 24, 2014) https://www.mlive.com/news/grand-rapids/index.ssf/2014/06/man_accused_of_human_trafficki.html.

[38] Aaron Martinez*, Man Pleads Guilty in Underage Sex Trafficking Case*, EL PASO TIMES,https://www.elpasotimes.com/story/news/2017/04/21/man-pleads-guilty-sex-trafficking-case/100754896/

e. Two men were arrested in Frederick, Maryland at a Super 8® in October 2016, and were charged with human trafficking-related offenses in relation to their crimes against a juvenile victim.[39]

f. From February 2016 through October 2017, a sex trafficking ring operated out of a Super 8® in Fort Worth, Texas and trafficked at least five juveniles including an individual as young as 16 years old.[40]

g. Authorities busted a sex trafficking operation at a Super 8® in Lakeland, Tennessee in June 2017, and rescued a 19 year old girl who was being held against her will and sold for sex.[41]

h. A July 2018, investigation on the premises of a Super 8® in Columbus, Georgia led to human trafficking charges against multiple suspects.[42]

i. A 16 year old boy who authorities believe to be a victim of human trafficking was rescued from a Super 8® in Duson, Louisiana in August 2018.[43]

j. In September 2018, a former member of the Oklahoma state legislature was sentenced to 15 years in prison on charges of child sex trafficking after he was found in room at a Super 8® hotel in March 2017, with a 17 year old boy.[44]

### D. THE SEX TRAFFICKING OF T.S.

54. The facts alleged herein stem from multiple sex trafficking rings operating in southern Ohio. While victimized by her traffickers in Ohio, T.S. was subject to repeated instances of rape, physical abuse, verbal abuse, exploitation, psychological torment, kidnapping, and false imprisonment at the Defendants' hotels from 2002-2012.

---

[39]Two Charged in Maryland with Rape, Human Trafficking, Others, NBC Washington, https://www.nbcwashington.com/news/local/Two-Charged-in-Maryland-with-Rape-Human-Trafficking-Others-395505801.html

[40] Domingo Ramirez, *Statewide Sex Trafficking Ring Operating in Fort Worth Shut Down With Eight Arrests,* FORT WORTH STAR-TELEGRAM,https://www.star-telegram.com/news/local/community/fort-worth/article179323426.html

[41] Sex Trafficking Operation Busted at Super 8 in Lakeland, WMCActionNews,http://www.wmcactionnews5.com/story/35657458/sex-trafficking-operation-busted-at-super-8-in-lakeland/

[42] Ben Wright, *Threesome and Drugs: Escorting App Leads to Human Trafficking Charges, Columbus Police Say*, LEDGER-ENQUIRER,https://www.ledger-enquirer.com/latest-news/article214760585.html

[43] Lester Duhe, *Authorities Investigate Human Trafficking Case Involving 16 Year Old Boy,* KLFY,https://www.klfy.com/news/local/authorities-investigate-human-trafficking-case-involving-16-year-old-boy/1360573674

[44] *ID.*

55.    In 2002, at 25 years old, T.S., a native of Wheeling, West Virginia, was living in a halfway house in Youngstown, Ohio when she met one of her traffickers after he offered her a better place to stay.

56.    T.S. was required to have sex for payment with various buyers at the Defendants' hotels in response to advertisements for commercial sex that her trafficker posted on www.backpage.com without her consent.[45]

57.    T.S. was sent by her trafficker to walk the prostitution-prone track that was Martin Luther King Drive in Youngstown, Ohio and service the buyers from the track at the nearby Super 8® at 4250 Belmont Avenue in Youngstown. Her trafficker made it clear that physical harm would be inflicted upon her if she did not fulfill the $200 a day quota he set for her.

58.    T.S.'s trafficker controlled her by making her dependent on crack cocaine and punishing her with physical violence every time she did not conform to his abundant rules.

59.    The Super 8® had doors that led to the exterior directly from the room.  Over three years, for five nights of the week, T.S.'s trafficker and his partner would rent a room for T.S. to service the clients she met on the track.  T.S. was forced to perform commercial sex acts on as many as six men in an evening. Each man entering and exiting the room at the Super 8® as an unannounced guest.

60.    T.S.'s trafficker and his partner frequently paid for the room one night at a time and always paid in cash.  The room was frequently left with numerous used condoms scattered across various surfaces at the end of the evening.  Regardless, T.S.'s trafficker and his partner would repeat the process multiple times a week.

61.    During her time in the custody of this trafficker, T.S. was arrested for prostitution during a police sting at the Super 8® as her trafficker waited in the parking lot. The buyer that T.S. was servicing was also arrested and ended up committing suicide in his holding cell.

62.    After T.S. was arrested, her trafficker's aggression escalated. He became more violent towards

---

[45] Backpage.com was the leading online marketplace for commercial sex, until it was seized by the federal authorities in April 2018. Backpage.com operated in 97 countries and 943 locations worldwide—and was last valued at more than a half-billion dollars. See STAFF OF PERMANENT SUBCOMMITTEE ON INVESTIGATIONS; 118TH CONG., REP. ON BACKPAGE.COM'S KNOWING FACILITATION OF ONLINE SEX TRAFFICKING (Comm. Print 2017).

T.S. and beat her daily. T.S. was prohibited from going to the hospital and was forced to continue servicing buyers, including at the same Super 8®. T.S. was arrested again for prostitution, violated her parole, and as a result went to prison.

63.    In the halfway house she was staying at in Columbus, Ohio after she was released from prison T.S. fell victim to another trafficker. This trafficker coerced T.S. to leave the halfway house and walk the nearby prostitution prone track that ran across Champion and Main Street on the east side of Columbus for his profit.  T.S. was again arrested for violating her parole, went back to prison, and shortly thereafter her trafficker was incarcerated for murder.

64.    T.S. was released from prison in 2008.  She met a man that had been actively courting her. T.S. genuinely believed that she was in a romantic relationship with this man until he too began to prostitute her. After a short time this man was trafficking T.S. through truck stops and the Defendants' hotels for commercial sex.

65.    Between 2008 and 2012, this trafficker routinely sold T.S. at hotels throughout Steubenville, Ohio including the Holiday Inn® at 1401 University Boulevard, where T.S. would service incoming clients under her trafficker's watch.

66.    This trafficker controlled a number of other women, so he would arrange regular sex parties for clients who regularly liked to spend large sums of money.  Numerous times throughout the week T.S.'s trafficker would buy out entire hallways of rooms at the Holiday Inn® in Steubenville.  Inside each of the rooms would be a woman prostituted by the trafficker to service buyers for his financial gain.

67.    While at the Holiday Inn® T.S. was watched and monitored by her trafficker or one of his friends to ensure she did not leave.  Someone was with T.S. at all times of the day.  Each buyer entering the Holiday Inn® was a non-paying guest and left shortly after they arrived.  The foot traffic to the rooms was constant and voluminous.

68.    T.S.'s trafficker paid in cash for numerous rooms along the same stretch of hallway for one night only.  And at the end of each evening abundant used condoms were scattered across the rooms. T.S. also observed that the Holiday Inn® had numerous surveillance cameras.

23

69.  On several occasions at both hotels, T.S.'s traffickers injured her so badly that she knew it was noticeable to the public. Paraphernalia was often left in the rooms when they left, and there was direct contact between her traffickers and hotel staff. Sometimes furniture in the room would be broken or stolen.

70.  Prior to, during, and following the incidents described herein, the Defendants had actual and/or constructive notice of drug dealing, prostitution, and/or general safety concerns at their hotels, including, but not limited to, video surveillance of their hotels, as well as oral or written complaints regarding said suspicious activity. The Defendants failed to take any actions to curtail these activities.

71.  Had the Defendants been paying attention to the activities being conducted at their hotels and on their properties, and the apparent red flags outlined above, it would have been impossible for them not to notice the victimization of T.S.

### E.  THE DEFENDANTS FACILITATED THE TRAFFICKING OF T.S.

72.  IHG and Wyndham profited from the sex trafficking of T.S. and knowingly or negligently aided and engaged with her trafficker in his sex trafficking venture. The Defendants leased rooms to T.S.'s traffickers, when they knew, or should have known, that he was using their room to imprison T.S., physically assault her, and subject her to repeated exploitation as he forced her into sexual servitude.

73.  IHG and Wyndham knew, or should have known, that T.S. was being trafficked and that the Defendants were knowingly benefiting financially from said exploitation, because T.S.'s trafficker frequented the Defendants' hotels.

74.  IHG and Wyndham knew, or should have known, that T.S. was being trafficked because T.S. was arrested on property grounds, constantly entertained traffic to appease her traffickers' daily quotas, and her traffickers would help check her in then not proceed to the room; behavior that indicated they were using the Defendants' hotels for his illegal sex trafficking venture.

75.  Defendants IHG and Wyndham actively participated in this illegal endeavor by knowingly or negligently providing lodging to T.S.'s trafficker in which to harbor T.S. while he was trafficking her.

76.  IHG and Wyndham profited from the sex trafficking of T.S. and knowingly or negligently aided

24

and participated with T.S.'s trafficker in his criminal venture. The Defendants took no action as T.S. repeatedly visited the hotel, often with different guests, without any luggage, avoiding all eye contact, and exhibiting signs of malnourishment, and often displaying prominent bruising all over her person.

77. Defendants IHG, and Wyndham actively participated in this illegal endeavor by knowingly or negligently providing lodging to those who purchased sex from T.S. in which to harbor T.S. while she was being trafficked.

78. The Defendants all had the opportunity to stop T.S.'s trafficker and offenders like him from victimizing T.S. and others like her. Instead, every Defendant failed to take reasonable measures to stop sex trafficking from occurring in their hotels.

79. The Defendants all financially benefited from the sex trafficking of T.S., and other victims like her, and developed and maintained business models that attract and foster the commercial sex market for traffickers and buyers alike.

80. IHG and Wyndham enjoy the steady stream of income that sex traffickers bring to their budget level hotel brands, such as Super 8$_®$ and Holiday Inn$_®$.

81. IHG and Wyndham financially benefit from their ongoing reputation for privacy, discretion, and the facilitation of commercial sex.

82. The Defendants failed to take any steps to alert the authorities, properly intervene in the situation, or take reasonable security steps to improve awareness of sex trafficking and/or prevent sexual exploitation on their properties.

83. The Defendants maintained their deficiencies to maximize profits by:

   a. Reducing the cost of training employees and managers of how to spot the signs of human trafficking and sexual exploitation and what steps to take;

   b. Not refusing room rentals, or reporting guests to law enforcement, in order to maximize the number of rooms occupied and the corresponding rates, even if the rooms rented were to sex traffickers or buyers;

   c. Lowering security costs by not having proper security measures, including, but not

25

limited to, employing qualified security officers to actively combat human trafficking and sexual exploitation;

84. As a direct and proximate result of these egregious practices on the part of the Defendants, T.S. and victims of sex trafficking and exploitation like her, have been permanently injured and damaged physically, emotionally, psychologically, and financially.

## CAUSES OF ACTION

### A. COUNT ONE – 18 U.S.C §1595 ("TVPRA")

85. The Plaintiff T.S. incorporates each foregoing allegation.

86. T.S. is a victim of sex trafficking within the meaning of 18 U.S.C. §1591(a) and is therefore entitled to bring a civil action under 18 U.S.C. §1595.

87. The Defendants' acts, omissions, and commissions, taken separately and/or together, outlined above, constitute a violation of 18 U.S.C. §1595. Specifically, the Defendants had a statutory obligation not to benefit financially from a venture that they knew, or should have known, to engage in violations of 18 U.S.C. §1591 (a). At all relevant times, the Defendants breached this duty by participating in, and facilitating, the harboring and providing of T.S. for the purposes of commercial sex induced by force, fraud, or coercion, by their acts, omissions, and commissions.

88. The Defendants have financially benefited as a result of these acts, omissions, and/or commissions by keeping operating costs low, and maintaining the loyalty of the segment of their customer base that seeks to participate in the sex trade. Moreover, the Defendants directly benefitted from the trafficking of T.S. on each occasion they received payment for rooms that she was being kept in at the Defendants' hotels. The actions, omissions, and/or commissions alleged in this pleading were the but for and proximate cause of T.S.'s injuries and damages.

89. T.S. has suffered substantial physical and psychological injuries as the result of being trafficked and sexually exploited at the Defendants' hotels and properties in violation of 18 U.S.C. §1591 (a).

**PRAYER FOR RELIEF**

WHEREFORE based on the forgoing the Plaintiff seeks injunctive relief in the form of a judgement requiring the Defendants to institute sufficient audits, policies, rules, and requirements of their employees, agents, franchisees, contractors, and/or all others operating under their flag, logo, trademark, or advertising  umbrella to insure that the actions and activities outlined above no longer occur and may not serve in the future to jeopardize the health and safety of individuals similarly situated  to the Plaintiff herein.

AND WHEREFORE the Plaintiff requests that the jury selected to hear this case render a verdict in her favor on all counts alleged, and against each and every named Defendant, separately and severally, and that it award damages to her in an amount which will adequately compensate her for the injuries and damages she sustained due to the Defendants' conduct outlined as follows:

a.  All available compensatory damages for the described losses with respect to each cause of action;

b.  past and future medical expenses, as well as the costs associated with past and future life care;

c.  past and future lost wages and loss of earning capacity;

d.   past and future emotional distress;

e.  consequential and/or special damages;

f.  all available noneconomic damages, including without limitation pain, suffering, and loss of enjoyment of life;

g.  disgorgement of profits obtained through unjust enrichment;

h.  restitution;

i.  punitive damages with respect to each cause of action;

j.  reasonable and recoverable attorneys' fees;

27

    k.   costs of this action; and

    l.   pre-judgment and all other interest recoverable

Also, on the basis of the foregoing, the Plaintiff requests that a jury be selected to hear this case and render a verdict for the Plaintiff, and against the Defendants, and that it award damages to the Plaintiff in an amount which adequately reflects the enormity of the Defendants' wrongs, and which will effectively prevent other similarly caused acts.   Further, the Plaintiff requests that the Court enter judgment consistent with the jury's verdict, and prays for any other damages and equitable relief the Court or jury deems appropriate under the circumstances.

**THE PLAINTIFF DEMANDS A TRIAL BY JURY**

Dated: December 12, 2019

                                        Respectfully Submitted,

                                        s/J. Corey Asay
                                        J. Corey Asay, 0090203
                                        Trial Attorney for Plaintiff T.S.
                                        Morgan & Morgan, P.A.
                                        333 W. Vine Street, Suite 1200
                                        Lexington, KY 40507
                                        T: (859) 286-8368
                                        F: (859) 286-8384
                                        E: CAsay@forthepeople.com

                                        T. Michael Morgan
                                        Florida Bar Number: 0062229
                                        Trial Attorney for Plaintiff T.S.
                                        Morgan & Morgan, P.A.
                                        20 N. Orange Avenue, Suite 1600
                                        Orlando, FL 32801
                                        Telephone Phone: (407) 420-1414
                                        Facsimile: (407) 641-5846
                                        Primary email: mmorgan@forthepeople.com
                                        *(Pro-Hac Vice)*

                                        Ashley Landers
                                        Kentucky Bar Number: 0094856
                                        Trial Attorney for Plaintiff T.S.
                                        Morgan & Morgan, P.A.
                                        333 W Vine St., Suite 1200
                                        Lexington, KY 40507
                                        Telephone: (859) 873-7406

28

Facsimile: (859) 899-8805
Primary email: alanders@forthepeople.com
*(Pro-Hac Vice)*

# EXHIBIT A



## Who We Are

The Blue Campaign is the unified voice for the U.S. Department of Homeland Security's (DHS) efforts to combat human trafficking. Working with law enforcement, government, and non-governmental and private organizations, the Blue Campaign strives to protect the basic right of freedom and bring those who exploit human lives to justice.

## What's Inside?

This **toolkit** offers tips and resources that can help you inform and educate your employees about human trafficking.

It includes **posters** of human trafficking warning signs for four groups of employee:

- Hotel and Motel Staff
- Housekeeping, Maintenance and Room Staff
- Concierge, Bellman, Front Desk, Security and Valet Staff
- Food and Beverage Staff

These posters can be displayed in common areas of your business where employees congregate (such as staff break, laundry and maintenance rooms).

www.dhs.gov/bluecampaign



# What is Human Trafficking?

Human trafficking is modern-day slavery and involves the use of force, fraud or coercion to obtain labor or commercial sex. Every year, millions of men, women and children are trafficked in countries around the world, including the United States.

There are different types of human trafficking:

- **Sex Trafficking**
  Victims of sex trafficking are manipulated or forced to engage in sex acts for someone else's commercial gain. Sex trafficking is not prostitution.

  Anyone under the age of 18 engaging in commercial sex is considered to be a victim of human trafficking. **No exceptions.**

- **Forced Labor**
  Victims of forced labor are compelled to work for little or no pay, often manufacturing or growing the products we use and consume every day.

- **Domestic Servitude**
  Victims of domestic servitude are forced to work in isolation and are hidden in plain sight as nannies, housekeepers or domestic help.

## Human trafficking and the hospitality industry

Traffickers often take advantage of the privacy and anonymity offered by the hospitality industry. They can operate discreetly because staff and guests may not know the signs of human trafficking.

You may have employees who are victims of forced labor. If a third party applied for a position on behalf of an individual or if employees are not receiving their own paychecks, these could be signs of human trafficking.

Hotels and motels are also major locations where traffickers force sex trafficking victims to provide commercial sex to paying customers. Victims may be forced to stay at a hotel or motel where customers come to them, or they are required to go to rooms rented out by the customers.

## What actions can I take at my business to help stop human trafficking?

You play a significant role in helping to stop this terrible crime by:

- Knowing the signs of human trafficking.
- Designing a plan of action to respond to reports of human trafficking in your business.
- Partnering with agencies that provide services to victims of human trafficking. In the case of lodging, consider offering vouchers to victims. Immediate housing for victims plays a vital role in beginning a victim's healing process.
- Providing employee training to help them understand and identify signs of human trafficking.
- Distributing and posting the fact sheets in this kit to your employees.

Information on additional resources, literature, materials, and training offered by the Blue Campaign can be found at www.dhs.gov/bluecampaign.





# SIGNS OF HUMAN TRAFFICKING
## For **Hotel** and **Motel** Staff

Hotel and motel employees are often in the best position to see potential signs of human trafficking, especially since your duties give you access to different areas of the properties. You may also have direct or indirect contact with both traffickers and victims.

### GENERAL INDICATORS

- Individuals show signs of fear, anxiety, tension, submission, and/or nervousness.
- Individuals show signs of physical abuse, restraint, and/or confinement.
- Individuals exhibit evidence of verbal threats, emotional abuse, and/or being treated in a demeaning way.
- Individuals show signs of malnourishment, poor hygiene, fatigue, sleep deprivation, untreated illness, injuries, and/or unusual behavior.
- Individuals lack freedom of movement or are constantly monitored.
- Individuals avoid eye contact and interaction with others.

- Individuals have no control over or possession of money or ID.
- Individuals dress inappropriately for their age or have lower quality clothing compared to others in their party.
- Individuals have few or no personal items—such as no luggage or other bags.
- Individuals appear to be with a significantly older "boyfriend" or in the company of older males.
- A group of girls appears to be traveling with an older female or male.
- A group of males or females with identical tattoos in similar locations. This may indicate "branding" by a trafficker.

*Each indicator alone may not necessarily mean a person is being trafficked.*

### WHAT TO DO IF YOU SUSPECT HUMAN TRAFFICKING

- Do not at any time attempt to confront a suspected trafficker directly or alert a victim to your suspicions.

- Call 9-1-1 for emergency situations—threats of violence, physical assault, emergency medical needs, etc.

- Follow your corporate protocol, such as by notifying management and security.

- Call 1-866-DHS-2-ICE (1-866-347-2423) to report suspicious criminal activity to federal law enforcement. Highly trained specialists take reports from both the public and law enforcement agencies. Submit a tip at www.ice.gov/tips.

- To get help from the National Human Trafficking Resource Center (NHTRC), call 1-888-373-7888 or text HELP or INFO to BeFree (233733).

www.dhs.gov/bluecampaign

33





# SIGNS OF HUMAN TRAFFICKING
For **Housekeeping, Maintenance,** and **Room Service** Staff

Housekeeping, maintenance, and room service staff typically have the most access to guest rooms where signs of human trafficking may be apparent. By being conscious of human trafficking indicators, you can help identify possible human trafficking activities and victims.

## GENERAL INDICATORS

- "Do Not Disturb" sign used constantly.
- Requests room or housekeeping services (additional towels, new linens, etc.), but denies hotel/motel staff entry into room.
- Refusal of cleaning services for multiple days.
- Excessive amounts of cash in a room.
- Smell of bodily fluids and musk.
- Presence of multiple computers, cell phones, pagers, credit card swipes, or other technology.
- The same person reserving multiple rooms.
- Individuals leaving room infrequently, not at all, or at odd hours.
- Children's items or clothing are present but no child registered with the room.

- Individuals loitering in hallways or appearing to monitor the area.
- Excessive amounts of alcohol or illegal drugs in rooms.
- Evidence of pornography.
- Minors left alone in room for long periods of time.
- Excessive number of people staying in a room.
- Extended stay with few or no personal possessions.
- Provocative clothing and shoes.
- Constant flow of men into a room at all hours.
- Excessive amounts of sex paraphernalia in rooms (condoms, lubricant, lotion, etc.).
- Rooms stocked with merchandise, luggage, mail packages, and purses/wallets with different names.

*Each indicator alone may not necessarily mean a person is being trafficked.*

## WHAT TO DO IF YOU SUSPECT HUMAN TRAFFICKING

- Do not at any time attempt to confront a suspected trafficker directly or alert a victim to your suspicions.

- Call 9-1-1 for emergency situations—threats of violence, physical assault, emergency medical needs, etc.

- Follow your corporate protocol, such as by notifying management and security.

- Call 1-866-DHS-2-ICE (1-866-347-2423) to report suspicious criminal activity to federal law enforcement. Highly trained specialists take reports from both the public and law enforcement agencies. Submit a tip at www.ice.gov/tips.

- To get help from the National Human Trafficking Resource Center (NHTRC), call 1-888-373-7888 or text HELP or INFO to BeFree (233733).

www.dhs.gov/bluecampaign

34





For **Concierge, Bellman, Front Desk, Security,** and **Valet** Staff

Concierge, bellman, front desk, security, and valet staff are typically the first to see guests when they enter the hotel. When checking in or requesting hotel amenities, a guest may exhibit behavior indicating human trafficking.

### GENERAL INDICATORS

- Patrons checking into room appear distressed or injured.
- The same person reserving multiple rooms.
- Few or no personal items when checking in.
- Room paid for with cash or pre-loaded credit card.
- Excessive use of hotel computers for adult oriented or sexually explicit websites.
- Patrons not forthcoming about full names, home address or vehicle information when registering.
- Minor taking on adult roles or behaving older than actual age (paying bills, requesting services).
- Patron appears with a minor that he or she did not come with originally.
- Rentals of pornography when children are staying in the room.
- Individuals dropped off at the hotel or visit repeatedly over a period of time.

- Individuals leaving room infrequently, not at all, or at odd hours.
- Minor with a patron late night or during school hours (and not on vacation).
- Individuals checking into room have no identification.
- Room is rented hourly, less than a day, or for long-term stay that does not appear normal.
- Patrons request information or access to adult services or sex industry.
- Room rented has fewer beds than patrons.
- Individuals selling items to or begging from patrons or staff.
- Individuals enter/exit through the side or rear entrances, instead of the lobby.
- Car in parking lot regularly parked backward, so the license plate is not visible.

*Each indicator alone may not necessarily mean a person is being trafficked.*

### WHAT TO DO IF YOU SUSPECT HUMAN TRAFFICKING

- Do not at any time attempt to confront a suspected trafficker directly or alert a victim to your suspicions.

- Call 9-1-1 for emergency situations—threats of violence, physical assault, emergency medical needs, etc.

- Follow your corporate protocol, such as by notifying management and security.

- Call 1-866-DHS-2-ICE (1-866-347-2423) to report suspicious criminal activity to federal law enforcement. Highly trained specialists take reports from both the public and law enforcement agencies. Submit a tip at www.ice.gov/tips.

- To get help from the National Human Trafficking Resource Center (NHTRC), call 1-888-373-7888 or text HELP or INFO to BeFree (233733).

www.dhs.gov/bluecampaign

35





# SIGNS OF HUMAN TRAFFICKING
## For **Food** and **Beverage** Staff

Food and beverage staff may have access to a guest's room or see them using the hotel restaurant or bar. Be conscious of these signs indicating a guest may be a victim of human trafficking.

### GENERAL INDICATORS

- Patron entertaining a minor at the bar or restaurant that he/she did not come in with originally.
- Patron claims to be an adult although appearance suggests he/she is a minor.
- Individuals loitering and soliciting male patrons.
- Individuals waiting at a table or bar and picked up by a male (trafficker or customer).
- Individuals asking staff or patrons for food or money.
- Individuals taking cash or receipts left on tables.

*Each indicator alone may not necessarily mean a person is being trafficked.*

### WHAT TO DO IF YOU SUSPECT HUMAN TRAFFICKING

Do not at any time attempt to confront a suspected trafficker directly or alert a victim to your suspicions.

Call 9-1-1 for emergency situations—threats of violence, physical assault, emergency medical needs, etc.

Follow your corporate protocol, such as by notifying management and security.

Call 1-866-DHS-2-ICE (1-866-347-2423) to report suspicious criminal activity to federal law enforcement. Highly trained specialists take reports from both the public and law enforcement agencies. Submit a tip at www.ice.gov/tips.

To get help from the National Human Trafficking Resource Center (NHTRC), call 1-888-373-7888 or text HELP or INFO to BeFree (233733).

www.dhs.gov/bluecampaign